ORIGINAL

Mark D. Rosenbaum, Esq. [S.B. #59940]
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017
Telephone: (213) 977-5000
Facsimile: (213) 977-5297
Email: mrosenbaum@aclu-sc.org

Anne Richardson, Esq. [S.B. #151541]
Reem Salahi, Esq. [S.B. #259711]
HADSELL STORMER
    RICHARDSON & RENICK LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Email: arichardson@hadsellstormer.com
        reem@hadsellstormer.com

Attorneys for Plaintiff
IMANE BOUDLAL

FILED
2012 SEP 13  AM 10: 40
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

IMANE BOUDLAL,

                    Plaintiff,

        vs.

THE WALT DISNEY COMPANY,
WALT DISNEY PARKS AND
RESORTS U.S., INC., and DOES 1-
10;

                    Defendants.

Case No: SA CV 12-1306 DOC (ANx)

[Assigned to the Honorable David O. Carter - Courtroom 9D]

**FIRST AMENDED COMPLAINT FOR DAMAGES FOR:**

1. Violation of Title VII's Prohibition of Discrimination and Harassment in Employment on the Basis of Religion, National Origin and Color and Failure to Remedy and Prevent Harassment (42 U.S.C. § 2000e-2(a))

2. Violation of the California Fair Employment and Housing Act's Prohibition of Harassment in

1

Employment on the Basis of Religious Creed, National Origin and Color (Cal. Gov't Code § 12940(j)(1))

3. Violation of the California Fair Employment and Housing Act's Prohibition of Discrimination in Employment on the Basis of Religious Creed (Cal. Gov't Code § 12940(a))

4. Failure to Remedy and Prevent Discrimination and Harassment (Cal. Gov't Code § 12940(k))

5. Wrongful Termination in Violation of Public Policy

6. Negligent Retention and Supervision

7. Intentional Infliction of Emotional Distress

**DEMAND FOR JURY TRIAL**

2

# I. INTRODUCTORY STATEMENT

1.     Imane Boudlal, the plaintiff in this case, is a 28 year old naturalized United States citizen of Moroccan origin and an adherent of the Muslim faith.  On or about April 12, 2008, she began working as a hostess at the Storytellers Café in the Grand Californian Hotel and Spa, part of the complex operated by The Walt Disney Company and Walt Disney Parks and Resorts U.S., Inc. (collectively "Disney" or "Defendants") in Anaheim, California.

2.     From early on in her employment, Ms. Boudlal suffered from repeated ethnic and religious slurs from her co-workers, which she reported to management. Among other things, she was called a "terrorist," "camel," and "Kunta Kinte," the slave from the famous book Roots by Alex Haley.  Ms. Boudlal's co-workers also mocked her by stating, among other things, that Arabs are terrorists, that she speaks the terrorist language and that she was trained to make bombs.  Ms. Boudlal repeatedly reported the harassment to her managers, who admitted there was a problem, but who never took any action.  On most occasions, Ms. Boudlal's managers merely deflected the complaints by stating that it would take time to change things.  Finally, one of the managers told her that she needed to stop complaining.

3.     As part of her Muslim faith, it is Ms. Boudlal's sincere religious belief that for her, the wearing of the hijab, sometimes referred to as a headscarf or veil, is commanded by the Qur'an, the sacred book of Islam.  The term hijab, translated as "cover," "curtain," or "veil," connotes the Islamic mandate of modesty and is regarded by much of the female Muslim population as an essential element of virtue and religiosity.  To unveil Muslim women who have chosen to wear a hijab is an act of intolerance forcibly requiring disavowal of and disrespect to their most fundamental religious beliefs.

4.     In June 2010, after two years of working at Disney, Ms. Boudlal determined that she would permanently wear a hijab so as to act faithfully in accord with her

3

religious beliefs. At about this time, Ms. Boudlal asked her supervisors for permission to wear the hijab in the course of her work. It was her intent in particular to begin wearing the hijab at work by the beginning of Ramadan, the Muslim holy month of fasting, which began on August 11, 2010. After a nearly two month delay, the managers denied her request, stating that wearing the hijab in her current position violated Disney's "look" policy. The managers stated that if Ms. Boudlal wore a hijab, it would negatively affect patrons' experiences at the Storytellers Café.

5.     Instead, Disney gave Ms. Boudlal an ultimatum that if she insisted on wearing a hijab while continuing to work for Disney: (1) she could either be stationed in the rear of the restaurant where she would have no contact with or exposure to customers or (2) she could wear several large hats of various colors on top of the hijab, which no one else at the Café was required to wear (or did wear). Disney managers told Ms. Boudlal that if she refused these options, they would terminate her employment. When Ms. Boudlal refused, explaining that she found these options humiliating and an infringement of her religious beliefs, Disney removed her from the Café's schedule and discharged her from further employment.

6.     Disney maintained its position despite the fact that Ms. Boudlal's hostess position did not require that she wear the costume of any Disney character, but rather a uniform as worn by other wait staff. Ms. Boudlal repeatedly sought to find a compromise, including offering to wear a hijab matching the colors of her uniform and even bearing a Disney logo. All her compromise offers were rejected out of hand by Disney management. Disney did not seek to enforce its "look" policy against other hosts or hostesses at the Storytellers Café who visibly displayed tattoos, crosses, and other religious insignia or wore their hair or did their nails in an ostentatious and impermissible manner.

7.     In enacting Title VII of the Civil Rights Act of 1964, Congress recognized

4

that America is a nation founded on the credo of religious, racial and national origin tolerance and therefore made it unlawful for an employee:

> (1) to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . color, religion . . . or national origin; or
>
> (2) to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . color, religion . . . . or national origin.

In violation of Ms. Boudlal's rights under Title VII on the basis of her religion, national origin and color, Disney failed to provide her with a working environment free of unlawful harassment and refused to provide a reasonable accommodation for her sincerely held religious belief that wearing a hijab is required by her faith and by providing favorable treatment to similarly situated persons outside her protected class. Disney's treatment of Ms. Boudlal fostered the unmistakable message that Disney both tolerated and encouraged the harassment which she suffered. California law similarly protects employees against discrimination and harassment on the basis of religion, national origin and color.

## II. JURISDICTION AND VENUE

8.     This lawsuit for damages and injunctive relief challenges Disney's failure to timely and effectively prevent and remedy harassment of Imane Boudlal based on her religion, national origin and color as well as Disney's refusal to provide reasonable accommodations for Ms. Boudlal's practice and observance of her religion, in violation of the laws of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, because the cause of action asserted arises under federal law, namely 42 U.S.C. § 2000e-2.

Additionally, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction for state law claims made under Cal. Gov't. Code § 12940, because such claims stem from part of the same case or controversy arising from a common nucleus of operative fact.

9. The employment practices alleged to be unlawful were and are now being committed within the County of Orange in State of California which is within the jurisdiction of the United States District Court for the Central District of California. Venue is therefore proper in this Court pursuant to 28 U.S.C. § 1391.

**III. PARTIES**

10. Plaintiff Imane Boudlal is a native of Morocco and a 28 year old naturalized citizen of the United States. Ms. Boudlal has adhered to the Muslim faith for her entire life. It is her sincerely held belief that wearing a hijab in public is required by her faith.

11. Defendants The Walt Disney Company, Walt Disney Parks and Resorts U.S., Inc., and Does 1-10 ("Disney" or "Defendants") at all relevant time conducted business within the County of Orange, California. Defendant The Walt Disney Company is incorporated in Delaware and headquartered in Burbank, California, It has four divisions: Studio Entertainment, Consumer Products, Media Networks, and Parks and Resorts. Defendant Walt Disney Parks and Resorts, U.S., Inc. is incorporated in Delaware and its principal place of business is in Florida. It owns and operates the Storytellers Café at the Grand Californian Hotel and Spa in Anaheim, California. At all relevant times, the Storytellers Café has had more than fifteen employees.

12. Plaintiff is unaware of the true names and legal capacities of the Defendants sued here as DOES 1 through 10 and, therefore, sues those Defendants by such fictitious names. Plaintiff will amend her complaint to allege their true names and capacities when the same has been ascertained. Plaintiff is informed and believes, and on this basis alleges, that each DOE Defendant is in some way legally

responsible for the acts, omissions, and damages alleged here to have been caused by each remaining Defendant.

## IV.  FACTUAL BACKGROUND

13.    In April 2008, Disney hired Imane Boudlal as a hostess at the Storytellers Café in the Grand Californian Hotel and Spa, part of the Disney complex in Anaheim, California.

14.    Ms. Boudlal is a practicing Muslim of Moroccan origin and a naturalized citizen of the United States.

### Hostile Work Environment

15.    Beginning in the summer of 2008, Ms. Boudlal became the subject of insults and epithets on the basis of her religion, national origin and color by her co-workers and supervisors.

16.    For a period of over two years from approximately July 2008 to August 2010, Ms. Boudlal's co-workers, including Sandra Acosta, and supervisors, including Jesus Serrano, Brian Cardenas, and Jaymee Koymoon, called her derogatory and discriminatory slurs.  On a weekly, if not daily basis, Ms. Boudlal's co-workers and supervisors would taunt her calling her such names as "camel," "terrorist," "bitch," and "Kunta Kinte," the slave from the famous book Roots by Alex Haley.  Ms. Boudlal was greatly pained by the name calling and repeatedly asked her co-workers and supervisors to stop, to no avail.

17.    Ms. Boudlal's co-workers and supervisors also made repeated comments to her that Arabs are terrorists, that she speaks the terrorist language, that she is trained to make bombs, that she gets scanned by security wherever she goes, that she escaped from her family, that people from her country bomb the soccer field when they don't win games, that she learned how to make bombs at the mosque and that she not kill a co-worker's boyfriend ("please don't kill my boyfriend! Terrorist!!"), to name a few.

18.    In an effort to end the harassment, Ms. Boudlal complained on numerous

7

occasions to her managers in writing and orally. Her written statements included:

    a. In July 2008, Ms. Boudlal provided a written statement to Manager Marissa Hermosa complaining of the name calling, harassment and hostile work environment. Ms. Hermosa never followed up with Ms. Boudlal to inform her of any corrective actions taken by Disney and the harassment continued.

    b. In May 2010, Ms. Boudlal provided a written statement to Manager Karun Kapata highlighting the hostile work environment and harassment that she was experiencing. Mr. Kapata never followed up with Ms. Boudlal to inform her of any corrective actions taken by Disney and the harassment continued.

    c. On July 27, 2010, Ms. Boudlal provided a written statement to Manager Bryan Maroun reiterating the hostility and harassment she was experiencing. In her statement, Ms. Boudlal noted that her co-workers were making fun of her based on her race and religion and that they called her "Kunta" and "terrorist." Mr. Maroun never followed up with Ms. Boudlal to inform her of any corrective actions taken by Disney and the harassment continued.

    d. On August 11, 2010, Ms. Boudlal provided a written statement to Manager James Nghiem with further details of harassment based on religion, national origin and color. In her statement, Ms. Boudlal noted that her coworker Sandra Acosta told Ms. Boudlal, "Look you[r] family are seating on that side" referring to an African American family and that her supervisor Jaymee Bryan called Ms. Boudlal "Kunta" and that those and other comments occurred "at least once a week." Ms. Boudlal also detailed other days when she provided her managers with written complaints. Mr. Nghiem never followed up with Ms. Boudlal to inform her of any corrective actions

taken by Disney and the harassment continued.

19. In addition, Ms. Boudlal verbally complained to her managers James Towning, Bryan Maroun, Karun Kaputa, Marissa Hermosa, James Nghiem, Erin Truax, and Mike Ashraft from July 2008 to the time of her termination. While Ms. Boudlal's managers admitted that the employees' actions were inappropriate, they failed to take any corrective action and merely deflected responsibility by informing Ms. Boudlal that she "just misunderstood [her] co-workers" and that "it will take time to change things." Finally, one of the managers told her that she needed to stop complaining and any future complaints needed to be made only to Manager Bryan Maroun.

20. At no point during Ms. Boudlal's employment was she informed that any corrective action was taken. Nor was Ms. Boudlal notified that her harassers were to be reprimanded or sanctioned for their actions. Indeed, Ms. Boudlal continued to experience harassment until the time of her termination.

### Ms. Boudlal's Decision to Wear a Hijab

21. Like many young Muslim women, Ms. Boudlal has given considerable thought and study to questions about what it means to be a devout religious person of her faith. Part of that inquiry concerned the decision to wear a hijab permanently and irreversibly, in both her private and public life. During 2009, Ms. Boudlal determined that Islam required that she wear a hijab in public. The only exception she made to this practice was for her work for Disney, as she feared that Disney would terminate her employment and she would lose necessary income. As consequence, Ms. Boudlal would remove her hijab in Disney's parking lot before entering the Café. This decision increasingly caused her to feel that she was unfaithful to a core tenet of her religion by living a double life as to her beliefs, and in June 2010 she therefore determined that she could not continue as a religious Muslim by removing her hijab in public, regardless of place or consequence. Ms. Boudlal therefore sought permission from Disney to wear her hijab in her position

9

as hostess at the Café.

22.    At no point did Disney or any of its managers or employees question the sincerity of Ms. Boudlal's religious practice or beliefs, or her decision to wear a hijab in the course of her work at Disney as a sincere expression of this practice and these beliefs.

### The Religious Significance of the Hijab

23.    The practice of Muslim women covering their bodies in the presence of non-familial men has deep roots in Islam.  Qur'anic passages have long supported a belief among many Muslim women prevalent through the ages and widespread in many parts of the Islamic world today, that the practice of veiling is the fulfillment of religious duty.  Ms. Boudlal is an adherent of this belief.

24.    To many Muslim women, then, beginning the practice of hijab is a step of enormous personal and spiritual import.  It is common practice for a Muslim woman to wait to wear the headscarf on a permanent and irreversible basis until a point in her life when she believes she has attained a level of religious piety signified by its wearing.  This was the case for Ms. Boudlal.  As a young person, she imagined herself one day ready to practice hijab, but did not feel spiritually yet prepared to do so.  Growing up, she had observed her faith in other ways she believed did not fully express the meaning and commands of Islam to her, including wearing the hijab during the holy month of Ramadan.

### The Storytellers Café and Disney's "Look" Policy

25.    The Storytellers Café serves an all-you-can-eat buffet-style breakfast, and offers pizza, sandwiches and salads for lunch and dinner.  It is described on the Disney website as celebrating the age-old theme of storytelling.  Disney characters such as chipmunks Chip 'n' Dale visit the restaurant floor to interact with customers.  However, the restaurant's wait and host staff do not wear period or character costumes.  Instead, these employees wear uniforms similar to those worn at many other restaurants, consisting of dark pants, a white shirt, and a gold vest.

Disney has claimed that the restaurant's costume and decorations reflect an early 19th century America theme, but the requirement that waitresses wear pants, among other facts, reflect that the stated theme is not applied rigorously, given that no woman in 19th century America wore pants at work.

26.     Disney states that it expects that all hourly paid personnel working for Disney Parks and Resorts to adhere to the company's "look" policy. It states too that its employees must comply with the policy "[n]o matter where [they] work or what [their] role is," because "anytime [they] are in a public area, [they] are 'on stage.'"

27.     However, the "look" policy is not applied at all or consistently at the Storytellers Café. For instance, although the policy prohibits visible tattoos, artificial hair that does not look natural, hair dyeing or highlighting that does not create a uniform look over the whole head, and fingernails that exceed one-fourth of an inch, each of these requirements has been routinely violated by multiple employees of the Café without repercussion. Christian employees observing Ash Wednesday were permitted by Disney to work with a cross of ashes on their foreheads despite the fact that this too facially violates the "look" policy.

28.     With respect to "headwear," Disney's "look" policy provides that "[t]he only hats and sun visors that may be worn are those issued by Costuming as part of the costume." However, the "look" policy permits employees to request exceptions for religious beliefs.

**Disney's Refusal of Ms. Boudlal's Request for Religious Accommodation**

29.     In June 2010, Ms. Boudlal had been wearing the headscarf in all public places at all times, except for her workplace, for approximately eight months, and had grown deeply uncomfortable living a double life respecting her religious and spiritual beliefs. Accordingly, Ms. Boudlal spoke with Ms. Erin Truax, Employee Relations Manager for Southern California, and requested an exception to Disney's "look" policy to wear the headscarf.

11

30.	Ms. Truax said that she needed to talk to "corporate" and would get back to Ms. Boudlal in a few weeks. She did not do so. Ms. Boudlal therefore called Ms. Truax repeatedly over the course of the next two months to obtain a response to her request, left numerous phone messages for her. She was twice told that Ms. Truax was on vacation. Ms. Truax never responded to these calls.

31.	Because Ms. Boudlal received no response from Ms. Truax regarding her request for religious accommodation, she was left with no alternative but to put a complaint in writing and she thereafter spoke with an employee relations representative in Florida. Only then did Ms. Truax set up an appointment with Ms. Boudlal to discuss her request to wear a headscarf while on the job. The meeting took place on July 30, 2010. At this meeting, Ms. Truax informed Ms. Boudlal that her request for accommodation was approved and that Disney would provide Ms. Boudlal with a scarf to match her uniform of green slacks, white blouse, and yellow vest. Ms. Boudlal stated that it was very important for her to be able to wear the hijab by the beginning of Ramadan, the Muslim month of fasting, which began on August 11, 2010 that year. Ms. Boudlal and Ms. Truax scheduled a time to go to the Disney costume department on August 9, 2010 to obtain measurements in order to be fitted for a head scarf. However, Disney managers unilaterally rescheduled the meeting to August 12, 2010, after Ramadan had begun.

32.	On August 12, 2010, Ms. Boudlal was accordingly fitted for a head scarf by the costuming director at Disney in Anaheim. Ms. Boudlal asked how long she would have to wait before she could wear a head scarf at work. Ms. Truax replied that because the measurements would have to be sent to Florida and thereafter corporate approval of a particular head scarf was required, she could not provide any estimate of a date. Ms. Truax also stated that this was the first time Disney had ever received such a request.

33.	The statement by Ms. Truax as to Disney's past history was in error. At least two prior actions on behalf of female Muslim employees had been brought

12

against Disney and settled.

34.    In the same conversation, Ms. Boudlal asked Ms. Truax if she could wear her hijab in the interim until Disney made a final decision. Ms. Truax refused this request and told Ms. Boudlal that Disney would need more time.

35.    Ms. Truax told Ms. Boudlal that she could wear her hijab if she transferred to the bakery, where she would work "in the back" unseen by customers. But Ms. Truax added that there were many experienced applicants in line for the bakery position and that it would be difficult for Ms. Boudlal to in fact secure the position. Indeed, the time period to apply for the bakery position had already passed.

36.    On Sunday, August 15, 2010, Ms. Boudlal arrived at work for a 6:30 a.m. to 1:00 p.m. shift. As she had received no further response from Ms. Truax or from anyone at Disney, she wore her own hijab. Her manager, Mike Ashraft, stated to her that he did not have a problem with her wearing the hijab, and Ms. Boudlal proceeded to work as hostess without incident.

37.    Some three hours later, at about 9:30 a.m., Ms. Boudlal was called into Mr. Ashraft's office. Mr. Ashraft and James Nghiem, another manager, then told her that she could not wear the hijab because it violated Disney's "look" policy and they were concerned about how her wearing a hijab would impact the experience of guests at Disney. Ms. Boudlal responded that her request had been approved on July 30 and that it was important to her religious belief to wear a hijab, especially as Ramadan had begun.

38.    Mr. Ashraft and Mr. Nghiem stated that she had only two options: she could wait until Disney provided her with a hat or something to cover her hijab or she could work in the rear of the Café out of sight of the guests. Otherwise, they stated that she would be required to leave the Café without pay. Ms. Boudlal rejected the options as an infringement of her sincerely held religious beliefs. The managers thereafter sent Ms. Boudlal home about three hours before the end of her shift.

39.    On the following day, August 16, 2010, Ms. Boudlal arrived for her assigned

shift, beginning at 7:30 a.m. She was wearing her hijab. Her manager, Bryan Maroun, asked to speak with her and told her that the hijab did not comply with the Disney "look." Mr. Maroun stated that she had only two options: she could work "backstage" away from customers and wear her hijab or she could return to her hostess position without her hijab until a hat or something to cover her hijab was provided to her. Ms. Boudlal rejected these options as an infringement of her sincerely held religious beliefs. Mr. Maroun thereafter sent Ms. Boudlal home.

40. During the time when Mr. Maroun was directing Ms. Boudlal to leave the Café, one hostess was wearing her hair in a manner that did not comply with the Disney "look" policy and tattooing on her body was visible.

41. On the following day, August 17, 2010, Ms. Boudlal arrived for her assigned shift, beginning at 2:00 p.m. She was wearing her hijab. Her managers, Mr. Ashraft, Mr. Nghiem and Mr. Maroun, told her that the hijab did not comply with the Disney "look" policy. Ms. Boudlal replied that employees at the Café violated the "look" policy and received no disciplinary treatment. Ms. Boudlal then asked how long it would be before Disney provided an accommodation for her hijab. The managers replied that they did not know. The managers thereafter sent Ms. Boudlal home.

**Ms. Boudlal's Continuing Efforts to Find a Reasonable Accommodation**

42. Ms. Boudlal met with Disney officials after August 17 to attempt to find a reasonable accommodation to her religious practice and belief requiring her to wear a hijab. Disney officials offered her only the option of wearing a hat over her hijab. No other employee at the Storytellers Café wears a hat. Ms. Boudlal rejected the option as an infringement of her sincerely held religious beliefs.

43. On August 31, 2010, Ms. Boudlal met with Disney officers. These officers offered her only the option of wearing a multi-colored head scarf made of the same material as her uniform vest under a hat made of the same material. No other employee at the Storytellers Café wears a hat. Ms. Boudlal rejected the option as

an infringement of her sincerely held religious beliefs, though she offered to wear alone the head scarf designed by Disney. Disney officers rejected this compromise and insisted that Ms. Boudlal wear a hat at all times.

44.     Disney thereafter informed Ms. Boudlal that she could work elsewhere in the Disney complex, but in all cases "behind the scenes" and away from public view. Ms. Boudlal rejected this option as an infringement of her sincerely held religious beliefs.

45.     Prior to Disney's failure to accommodate Ms. Boudlal's request to wear hijab, Ms. Boudlal had requested a religious accommodation to break her fast. In the summer of 2008, Ms. Boudlal notified her manager Jeffrey (last name unknown) that she would be fasting from sunrise to sunset during the Muslim holy month of Ramadan. Ms. Boudlal requested that she be allowed to take her lunch time break at approximately 7:30 p.m., at the time of sunset, in order to break her fast and have a meal. Jeffrey denied the accommodation request noting that the Café would be busy at that time and that she would need to wait until it slowed down. Ms. Boudlal was forced to take a "restroom" break at sunset to eat a small morsel of food to break her fast. If she was unable to take a "restroom" break, Ms. Boudlal was forced to break her fast hours later.

46.     Ms. Boudlal is no longer an active employee at Disney. Disney has not offered Ms. Boudlal any hours or placed her on the work schedule since August 21, 2010. Indeed, Ms. Boudlal hasn't worked at the Storyteller's Café since August 15, 2010, shortly after Ms. Boudlal rejected Disney's ultimatum to either wait and wear a hat at all times or work "behind the scenes".

47.     Ms. Boudlal was not provided a reasonable accommodation by Disney for her sincerely held religious beliefs. But for the illegal and discriminatory action by Disney, Ms. Boudlal would have been continuously employed at the Storytellers Café. By virtue of her illegal termination, Ms. Boudlal has been disadvantaged in future pursuit of employment.

15

48. On August 18, 2010, Ms Boudlal jointly filed a claim of national origin, color and religious discrimination against Disney with the EEOC and DFEH.

49. Ms. Boudlal has exhausted her administrative remedies and received her Notice of Right to Sue from the EEOC on August 8, 2012.

**V. CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**Violation of Title VII's Prohibition of Discrimination and Harassment in Employment on the Basis of Religion, National Origin and Color and Failure to Remedy and Prevent Harassment**

**(42 U.S.C. § 2000e-2(a))**

**[Plaintiff Against All Defendants]**

50. Plaintiff incorporates paragraphs 1 through 49 of this Complaint as if fully set forth herein.

51. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer:

> (1) to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . color, religion . . . or national origin; or
>
> (2) to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . color, religion . . . . or national origin.

42 U.S.C. § 2000e-2(a). Title VII defines religion to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

52.   Title VII's prohibition on employment discrimination and harassment on the basis of religion, national origin and color applies to all businesses with fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. 42 U.S.C.A. § 2000e. The Walt Disney Company and Walt Disney Parks and Resorts U.S., Inc. generally and Storytellers Café specifically have had more than fifteen employees at all relevant times.

53.   In violation of Title VII, plaintiff Boudlal was subjected to offensive comments and other abusive conduct that was severe and pervasive by both her supervisors and co-workers based on her religion, national origin and color, altering the conditions of her employment. The conduct was unreasonably abusive and created an offensive and hostile work environment for plaintiff and for any reasonable person in plaintiff's position.

54.   In violation of Title VII, plaintiff's supervisors harassed plaintiff by calling her discriminatory and derogatory slurs such as "camel," "terrorist" and "Kunta Kinte." Plaintiff's supervisors also made discriminatory and derogatory comments related to plaintiff's religion, national origin and color including that Arabs are terrorists, that she speaks the terrorist language, that she is trained to make bombs, and that she gets scanned by security wherever she goes.

55.   In violation of Title VII, Disney's management failed to take prompt action to remedy and prevent the harassment by plaintiff's supervisors and co-workers. Defendants further failed to train, supervise, and monitor their employees and agents. Indeed, Ms. Boudlal's managers deflected responsibility by informing plaintiff that she "just misunderstood [her] co-workers" and that "it will take time to change things." Finally, one of the managers told her that she needed to stop complaining.

56.   Defendants' failure to take reasonable steps to prevent harassment based on religion, national origin and color fostered, created and encouraged an environment where such harassment was condoned, encouraged, tolerated, sanctioned and/or

17

ratified.

57. Defendant Disney is vicariously liable for the unlawful acts of its agents and employees directly and/or under the doctrine of respondeat superior. The Equal Employment Opportunity Commission (EEOC) defines a supervisor as someone with the power to direct the employee's daily work activities. Plaintiff's harassing supervisors directed Ms. Boudlal's daily work activities, amongst other roles.

58. Plaintiff Boudlal continuously complained to Disney's management about the harassing conduct of her supervisors in writing and orally from approximately July 2008 to the time of her termination, yet defendant Disney failed to take decisive steps to end the misconduct.

59. In violation of Title VII, defendant Disney discriminated against Ms. Boudlal on the basis of her religion by refusing to provide a reasonable accommodation for her sincerely held religious belief that wearing a hijab is required by her faith.

60. In violation of Title VII, defendant Disney also discriminated against Ms. Boudlal on the basis of her religion by removing her from the schedule and not permitting her to return to work in her current position if wearing her hijab, while providing more favorable treatment of similarly situated persons outside her protected class and through other acts or omissions giving rise to an inference of discrimination.

61. As a direct and proximate result of defendants' unlawful conduct, Ms. Boudlal has suffered and will continue to suffer emotional injuries, including, but not limited to, emotional distress, depression and anxiety. Plaintiff has suffered and continues to suffer loss of earnings and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

62. The conduct of defendants, through their agents, as described herein was malicious, fraudulent, and oppressive and/or done with knowledge that they were

18

acting in violation of federal and state law, and/or with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences of their actions. Consequently, plaintiff is entitled to punitive damages.

## SECOND CAUSE OF ACTION

**Violation of the California Fair Employment and Housing Act's Prohibition of Harassment in Employment on the Basis of Religious Creed, National Origin and Color**

**(Cal. Gov't Code § 12940(j)(1))**

**[Plaintiff Against All Defendants]**

63.     Plaintiff Boudlal incorporates paragraphs 1 through 62 of this Complaint as if fully set forth herein.

64.     California's Fair Employment and Housing Act (FEHA) proscribes employers from harassing an employee "because of . . . religious creed, color, national origin." Cal. Gov't Code § 12940(a).

65.     Further, FEHA makes it unlawful for an employer that "knows or should have known of this conduct and fails to take immediate and appropriate corrective action." *Id.*

66.     In violation of FEHA, plaintiff Boudlal was subjected to offensive comments and other abusive conduct based on her religion, national origin and color by her supervisors and co-workers that was severe and pervasive, altering the conditions of her employment. The conduct was unreasonably abusive and created an offensive and hostile work environment for plaintiff and for any reasonable person in plaintiff's position.

67.     In violation of FEHA, plaintiff's supervisors and co-workers harassed plaintiff by calling her discriminatory and derogatory slurs such as "camel," "terrorist" and "Kunta Kinte." Plaintiff's supervisors and co-workers also made discriminatory and derogatory comments related to plaintiff's religion, national origin and color including that Arabs are terrorists, that she speaks the terrorist

19

language, that she is trained to make bombs, and that she gets scanned by security wherever she goes.

68.     Plaintiff Boudlal repeatedly complained to her managers about the harassing conduct of her supervisors and co-workers in writing and orally from approximately July 2008 to the time of her termination.

69.     In violation of FEHA, Ms. Boudlal's managers failed to take prompt and appropriate action to remedy and prevent the harassment of plaintiff by her supervisors and co-workers.  Indeed, Ms. Boudlal's managers deflected responsibility by informing plaintiff that she "just misunderstood [her] co-workers" and that "it will take time to change things."  Finally, one of the managers told her that she needed to stop complaining.

70.     Defendant Disney is strictly liable for the offensive and harassing conduct of its supervisors.  The FEHA defines a supervisor as someone with the power to direct the employee's daily work activities as was the case with Ms. Boudlal's supervisors.

71.     As a direct and proximate result of defendants' unlawful conduct, Ms. Boudlal has suffered and will continue to suffer emotional injuries, including, but not limited to, emotional distress, depression and anxiety.  Plaintiff has suffered and continues to suffer loss of earnings and other employment benefits.  Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

72.     The conduct of defendants, through their agents, as described herein was malicious, fraudulent, and oppressive and/or done with knowledge that they were acting in violation of federal and state law, and/or with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences of their actions.  Consequently, plaintiff is entitled to punitive damages.

///

///

## THIRD CAUSE OF ACTION

**Violation of the California Fair Employment and Housing Act's Prohibition of Discrimination in Employment on the Basis of Religious Creed**

**(Cal. Gov't Code § 12940(a))**

**[Plaintiff Against All Defendants]**

73. Plaintiff Boudlal incorporates paragraph 1 through 72 of this Complaint as if fully set forth herein

74. California's Fair Employment and Housing Act (FEHA) makes "it is an unlawful employment practice . . . [f]or an employer, because of the . . . religious creed . . . of any person, . . . to discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov't Code § 12940(a).

75. Further, FEHA prohibits "an employer … [from] discriminat[ing] against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer . . . demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, including the possibilities of excusing the person from those duties that conflict with his or her religious belief or observance or permitting those duties to be performed at another time or by another person, but is unable to reasonably accommodate the religious belief or observance without undue hardship on the conduct of the business of the employer or other entity covered by this part." Cal. Gov't Code § 12940(l).

76. FEHA's prohibition on discrimination in employment on the basis of religious creed applies to businesses regularly employing five or more persons. Cal. Gov't Code § 12926. The Walt Disney Company and Walt Disney Parks and Resorts U.S., Inc. generally and Storytellers Café specifically have employed more than five persons at all relevant times.

77. In violation of FEHA, defendant Disney discriminated against Ms. Boudlal

21

on the basis of her religious creed by removing her from the schedule and not permitting her to return to work in her current position if wearing her hijab, while providing more favorable treatment of similarly situated persons outside her protected class and through other acts or omissions giving rise to an inference of discrimination.

78.   As a direct and proximate result of defendants' unlawful conduct, Ms. Boudlal has suffered and will continue to suffer emotional injuries, including, but not limited to, depression and anxiety.  Plaintiff has suffered and continues to suffer loss of earnings and other employment benefits.  Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

79.   The conduct of defendants, through their agents, as described herein was malicious, fraudulent, and oppressive and/or done with knowledge that they were acting in violation of federal and state law, and/or with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences of their actions. Consequently, plaintiff is entitled to punitive damages.

## FOURTH CAUSE OF ACTION

### Failure to Remedy and Prevent Discrimination and Harassment

### (Cal. Gov't Code § 12940(k))

### [Plaintiff Against All Defendants]

80.   Plaintiff Boudlal incorporates paragraph 1 through 79 of this Complaint as if fully set forth herein.

81.   FEHA requires employers to take "all reasonable steps necessary to prevent discrimination and harassment from occurring."  Cal. Gov't Code § 12940(k).

82.   In violation of FEHA, Plaintiff Boudlal was subjected to severe and pervasive harassment and discrimination based on her religious creed, national origin and color.  Plaintiff Boudlal complained about the harassment and discrimination to her managers on multiple occasions in writing and orally from approximately July 2008 to the time of her termination.

22

83. In violation of FEHA, defendants failed to take all reasonable steps necessary to prevent discrimination and harassment based on plaintiff's religious creed, national origin and color. In addition, defendants failed to remedy such discrimination and harassment when they realized and were informed that it was occurring. Defendants further failed to train, supervise, and monitor their employees and agents.

84. Indeed, Ms. Boudlal's managers deflected responsibility by informing plaintiff that she "just misunderstood [her] co-workers" and that "it will take time to change things." Finally, one of the managers told her that she needed to stop complaining. Defendants' failure to take reasonable steps to prevent discrimination and harassment based on religious creed, national origin and color fostered, created and encouraged an environment where such discrimination and harassment was condoned, encouraged, tolerated, sanctioned and/or ratified.

85. As a direct and proximate result of defendants' unlawful conduct, Ms. Boudlal has suffered and will continue to suffer emotional injuries, including, but not limited to, emotional distress, depression and anxiety. Plaintiff has suffered and continues to suffer loss of earnings and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

86. The conduct of defendants, through their agents, as described herein was malicious, fraudulent, and oppressive and/or done with knowledge that they were acting in violation of federal and state law, and/or with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences of their actions. Consequently, plaintiff is entitled to punitive damages.

## FIFTH CAUSE OF ACTION

### Wrongful Termination in Violation of Public Policy

### [Plaintiff Against All Defendants]

87. Plaintiff Boudlal incorporates paragraphs 1 through 86 of this Complaint as

23

if fully set forth herein.

88.     For all the reasons set forth above, the conduct of defendants in not offering Ms. Boudlal any hours or placing her on the work schedule since August 21, 2010 constituted termination. Such termination is contrary to public policy, as embodied in the following laws, statutes and regulations, among others: all state and federal statutes and regulations prohibiting discrimination and failure to accommodate religion, including Title VII and the Fair Employment and Housing Act.

89.     As a direct and proximate result of defendants' unlawful conduct, Ms. Boudlal has suffered and will continue to suffer emotional injuries, including, but not limited to, depression and anxiety. Plaintiff has suffered and continues to suffer loss of earnings and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

90.     The conduct of defendants, through their agents, as described herein was malicious, fraudulent, and oppressive and/or done with knowledge that they were acting in violation of federal and state law, and/or with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences of their actions. Consequently, plaintiff is entitled to punitive damages.

### SIXTH CAUSE OF ACTION

**Negligent Retention and Supervision**

**[Plaintiff Against All Defendants]**

91.     Plaintiff Boudlal incorporates paragraphs 1 through 90 of this Complaint as if fully set forth herein.

92.     Plaintiff Boudlal was subjected to severe and pervasive harassment and discrimination based on her religious creed, national origin and color by her supervisors and co-workers. Plaintiff Boudlal complained of the harassment and discrimination to her managers on multiple occasions in writing and orally from approximately July 2008 to the time of her termination.

93.     Defendants failed to take immediate and appropriate corrective action. In

24

failing to do so, defendants showed demonstrable negligence in the retention and supervision of their employees resulting in a foreseeable harm on plaintiff. Defendants' negligence created and encouraged an environment where such discrimination and harassment was condoned, encouraged, tolerated, affirmatively authorized and/or ratified.

94. As a direct and proximate result of defendants' unlawful conduct, Ms. Boudlal has suffered and will continue to suffer emotional injuries, including, but not limited to, depression and anxiety. Plaintiff has suffered and continues to suffer loss of earnings and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

95. The conduct of defendants, through their agents, as described herein was malicious, fraudulent, and oppressive and/or done with knowledge that they were acting in violation of federal and state law, and/or with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences of their actions. Consequently, plaintiff is entitled to punitive damages.

## SEVENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### [Plaintiff Against All Defendants]

96. Plaintiff Boudlal incorporates paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97. As described above, the conduct of defendants and their agents/employees was outrageous and outside the normal scope of the employment relationship. Specifically, defendants' harassment and discrimination toward plaintiff based on religion, national origin and color, in violation federal and state law, constitute conduct outside of the normal scope of the employment relationship and violative of public policy.

98. Defendants knew that their conduct would result in plaintiff's severe emotional distress, and said conduct was perpetrated by defendants with the intent

25

to inflict, or with reckless disregard of the probability of inflicting humiliation, mental anguish, and severe emotional distress upon plaintiff. Such conduct did, in fact, result in severe emotional distress on plaintiff.

99. As a direct and proximate result of defendants' unlawful conduct, Ms. Boudlal has suffered and will continue to suffer emotional injuries, including, but not limited to, depression and anxiety. Plaintiff has suffered and continues to suffer loss of earnings and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

100. The conduct of defendants, through their agents, as described herein was malicious, fraudulent, and oppressive and/or done with knowledge that they were acting in violation of federal and state law, and/or with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences of their actions. Consequently, plaintiff is entitled to punitive damages.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor:

(a) Declaring that the actions of Defendants described above constitute harassment on the basis of religion or religious creed, national origin and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12940(j)(1) and 12940(k).

(b) Declaring that the actions of Defendants described above constitute discrimination on the basis of religion or religious creed in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12940(a) and 12940(l).

(c) Permanently enjoining Defendants and its directors, officers, agents, and employees from enforcing its policy or practice of prohibiting wait or host staff employees who are adherents of the Muslim faith from wearing hijabs while in

positions involving interaction with customers unless such hijabs are concealed by a hat or other object.

(d) Training of Disney employees, supervisors and managers regarding harassment and discrimination;

(e) Awarding Plaintiff applicable statutory, actual, and punitive damages under each cause of action;

(f) Awarding Plaintiff her expenses, costs, fees, and other disbursements associated with the filing and maintenance of this action, including reasonable attorneys' fees pursuant to 42 U.S.C. §2000e-5(k), California Gov't Code §12965, California Code of Civ. Proc. §1021.5 and any other applicable provision of law;

(g) Awarding such other equitable and further relief as the Court deems just and proper.

Dated: September 11, 2012    Respectfully submitted,

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

By: _Mark Rosenbaum (AR)_____
   Mark D. Rosenbaum
   Attorneys for Plaintiff
   IMANE BOUDLAL

Dated: September 11, 2012    Respectfully submitted,

HADSELL STORMER
 RICHARDSON & RENICK, LLP

By: _Anne Richardson_____
   Anne Richardson
   Reem Salahi
   Attorneys for Plaintiff
   IMANE BOUDLAL

27

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Dated:  September 11, 2012                Respectfully submitted,

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA


By: _Mark D. Rosenbaum (AR)_
        Mark D. Rosenbaum
        Attorneys for Plaintiff
        IMANE BOUDLAL


Dated:  September 11, 2012                Respectfully submitted,

HADSELL STORMER
    RICHARDSON & RENICK, LLP


By: _Ann Reln_
        Anne Richardson
        Reem Salahi
        Attorneys for Plaintiff
        IMANE BOUDLAL

## PROOF OF SERVICE

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 128 N . Fair Oaks Avenue, Pasadena, California 91103.

On September 12, 2012, I served the foregoing document described as: **FIRST AMENDED COMPLAINT FOR DAMAGES** on the interested parties in this cause by placing true and correct copies thereof in envelopes addressed as follows:

| | |
|---|---|
| James A. Zapp, Esq.<br>Felicia A. Davis, Esq.<br>PAUL HASTINGS LLP<br>515 South Flower Street<br>Twenty-Fifth Floor<br>Los Angeles, California 90071-2228<br>Tel: (213) 683-6000<br>Fax: (213) 627-0705<br>Email: jameszapp@paulhastings.com<br>Email: feliciadavis@paulhastings.com | **Attorneys for Defendants** |

<u>XX</u>  **BY E-MAIL**

XX   I served the above-mentioned document electronically on the parties listed at the e-mail addresses above and, to the best of my knowledge, the transmission was complete and without error in that I did not receive an electronic notification to the contrary.

<u>XX</u>  **BY MAIL**

XX I deposited such envelope in the mail at Pasadena, California. The envelope was mailed with postage thereon fully prepaid.

____ I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on the same day with postage thereon fully prepaid at Pasadena, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing this affidavit.

Executed on September 12, 2012, at Pasadena, California.

<u>XX</u>    (Federal)    I declare that I am employed in the office of a member of the bar of this Court at whose direction the serve was made.

_____
Bianca Ramirez
Declarant